Good morning, everyone. We have one case on the calendar this morning. It's number 2009-1504, I4I v. Microsoft. Before we start, without having a clock run, I just wanted to, on behalf of the panel, take care of a couple of housekeeping matters. There are presently two motions before the court. One is a motion, I guess, on behalf of I4I to have the court reconsider its disposition of its earlier motion for leave to file a corrected Volume 5 of the Joint Appendix. We are going to deny that motion. However, the parties can be assured that all pertinent documents will be maintained under seal so that they're not available to the public at large in connection with that motion. The second motion that is before the court is an additional motion by I4I to file a replacement version of Exhibit 13 to an original confidential response in connection with the motion to stay the injunction. That motion will be granted. The other matter we just wanted to address before we start the oral argument is the panel has noted that in the joint appendices there are a number of confidentiality markings and we wanted to inquire as to how significant those are because often if there's extensive confidentiality material it's somewhat difficult to write an opinion. Should we be, in terms of an opinion that gets written down the road, be significantly concerned about confidentiality markings, Mr. Powers? Your Honor, I believe that everything in the joint appendix was used in open court below and also although it was designated confidential by one party it would be, I believe, for purposes of discovery, by the time of trial, it was used in open court so I don't think there should be any constraint on your honor's decision. Thank you. Mr. Dunner, do you have anything to add to that? Nothing to add to that. Okay, fine. Well, that's good. Thank you very much. With those matters out of the way, we'll turn to the oral argument. I just want to confirm, Mr. Powers, you've reserved five minutes for rebuttal? Yes, Your Honor. Okay, you can begin whenever you're ready. May it please the Court, I'd like to begin with plain construction if I may because there's a key admission in the red brief that in our view changes the landscape of this issue. The term, of course, at issue is distinct storage of the AmeriCorps map, distinct from the content of the document. That term, of course, under this Court's precedence, must be given effect and meaning. That requirement is all the more important in light of the admission in the red brief that this requirement of distinctness, as they put it at page 14, quote, the invention's key is to treat the metacodes and content distinctly such that each may be treated as a separate entity, close quote. The invention can treat content and metacodes as distinct entities because it stores the two as distinct entities. That is an important admission and concession in two respects. One, the district court had held that this concept of distinct storage and permitting independent manipulation was merely one benefit, possible benefit of the invention and not a requirement. The language that I4I chose in its red brief goes far beyond that and makes clear that distinctness is in fact key to the invention as the title, the specification, and the file history make clear. But beyond that, and perhaps even more importantly, I4I's brief concedes now that while they don't concede it must be in distinct files. They concede that the math and the content must be treatable and storable as distinct entities, which is not what the district court's construction required. The district court's construction, which effectively read distinctness out or made it meaningless, was merely that distinct storage of the math and content meant that it must be in different addresses or, as the court put it, different portions of memory. Well, my question goes to Figure 9, which is, I think, central to the argument you're making in the specification. Why does Figure 9 really teach that independent manipulation of the content is not required? That's how I understand Figure 9, with the content can't be changed, even though the user is making the changes to the content in Figure 9, as I understand it. It can't be changed without changing the metacodes, which is what happens down at the bottom of the figure. So why isn't that at least one embodiment, one example, where it can be but it does not require that it be? Your Honor is, I think, referring to the argument that I4I made regarding its embodiment of later updating, which is certainly, we'd never deny that, and we argue that issue below. As I4I admits in its brief at page 47, there is a difference, and a key difference, between the embodiment that Your Honor is discussing and what this claim is about. The claims at issue are about the editing process. The editing process is the process by which you will either change a metacode or change the content, and in that process, the pattern is consistent across all embodiments, ranging from the title, to the abstract, to the summary of the invention, and repeatedly in the file history, in saying that the whole point of this is that you can edit either content or metacodes without touching, accessing, or even knowing the other. Now, this synchronization or later updating, of course happens. Of course, obviously, you're going to want to have the final document integrate whatever the changes were in the metacodes or the changes in the content, when you reproduce the final document later. That's never been an issue. That is a later process that's not covered by the claims at issue. And at page 47... Well, I'm not sure. As I understand this document in Figure 9, this processing system, this is the invention, and so what the invention does is change the update, the metacodes. That's part of the invention. As I understand the way these documents, these figures work, and they're all differentalities. I would put it differently, Your Honor. I would say it is part of the later process that they envision in integrating the later document. And that difference... The later process, I mean, when you look at Figure 9 and it talks about the processing system, isn't this a description of the invention? No, it's not. Not of the invention of the claims at issue. There are other claims that cover that aspect. And at page 47 of their brief, I4I recognized exactly the distinction that you're referring to. And they say that the teaching of the patent is consistent with synchronization about editing because the restriction is based on the user's ability to edit content, which is, of course, what these claims, the asserted claims, are about. When the district court said a data structure that contains the plurality of metacodes, why isn't that the distinct mat storage means? You argue in favor of files, but with the exception of a few errant comments in the prosecution history, I see nothing in the patents to require separate files. I know it may be the easiest way to achieve the various advantages that you're discussing, but it's not a requirement of the claims that I'm having trouble finding something akin to a clear and unmistakable disclaimer such that I should suddenly make it a part of the claim. I know there's a lot there. Sorry. I understand your first question. There's two pieces to it, so let me take them in pieces. The first relates to the data structure question. The data structure, as applied by the district court and argued below and permitted to be argued below, was essentially meaningless with regard to distinct storage. Because the data structure requirement was satisfied as long as you had a pointer from one point in the data structure to a storage location someplace else, which then pointed to someplace else, which pointed to someplace else. And so when we asked Dr. Ryan, their expert, precisely the question you're asking, exactly that question, and his answer is telling. His answer was, quote, if all you have are these pointers, then it can't be distinct. And his answer was, quote, and this is at 1266 in the record. Wait a minute, but this is the testimony, if I'm remembering right, that goes to Microsoft's accused system. And I remember that he pointed to, if I'm remembering right, six distinct places in the Microsoft accused system where you have to pull this, this, this, this piece all together, and then you have the data structure at issue. But that is not an issue of claim construction, Mr. Powers. That's an issue of infringement, and you have not appealed to us the sufficiency of the evidence regarding whether Microsoft has established, Microsoft has the data structure that is at issue. And when I focus on claim construction, it seems to me the district court has required a distinct structure. I may agree with you, Microsoft doesn't have it, but that's not an issue on appeal before us. It depends on what is meant by data structure, which is then informed by how that was argued below. If data structure meant a distinct entity, as I for I now concede, I would agree with you. It does not. It can be, all it means, according to their expert, is different pieces stored in different places, anywhere, just different addresses, as long as there is some pointer or other reference to them. And that goes to whether distinct storage is satisfied by a data structure. But your alternative construction included a file. I see nothing in that, there's no reference to the word file in the specification, is there? That's true. Is there anything in the prosecution history that I'm missing with respect to a file? So I don't see where you're, I mean, you came up with an alternative claim construction that required a separate file, and I'm not seeing where logistic court could have come up or agreed with your proposed claim construction. The source of file, you're right, there's nothing in the specification. The source of file is a distinction of the Mazuda reference in the file history. And in that reference, one of the arguments that was made was the content and the metacodes were all in the same file, and therefore couldn't be treated distinctly. That was an argument that was made against Mazuda. That was the source of it. But if I may, because I believe that for us the more important argument is not so much the file issue. You're exactly right, Judge Moore, that was our way of trying to capture distinctness and to make it meaningful in a computer context. It's perhaps true that there are other ways to do it, that isn't the source that we found in the file history. The key distinction in our mind is that however you do it, it must permit and enable independent manipulation of the metacodes and the content. That is clear from the title of the patent. It is clear from the abstract. But you know, I mean, honestly, I spent quite a bit of time, because I said, well, but this title was even amended during prosecution. How is that not relevant? And the Pitney v. H.C. case that Chief Judge Michelle wrote had the exact same facts and said the title is not something to be considered, even though in that very case it had been amended during prosecution to effectively add a limitation. So I'm sympathetic to you. Unfortunately, I just don't have precedent that allows me to consider that. If we were relying on the title alone, I would be concerned by that precedent. The fact is the title is consistent. It's part of a consistent pattern throughout the specification. The abstract, this Court's precedents make quite clear that the abstract is something to be considered for claim construction. And this Court's precedents make even more clear that a statement in the summary of the invention which says the present invention, which is true at column 7, line 6 to 10. In the present invention, and it emphasizes that in the present invention, and I'll quote, the present invention provides the ability to work solely on metacodes. The process allows changes to be made to the structure of a content, with a document without requiring content. Hold on. You started with the present invention, which then you jump to the processes, which is not the next sentence. So I don't know where you're going. So the present invention is at line 17. What column are we on? Column 7. I'm at column 7, line 6 to 10. Oh, 6 to 10. Okay. And it reads in full, the present invention provides the ability. Got it. Now I'm with you. Okay. And the process allows changes to be made in the structure. Additionally, a new map can be created solely based on the existing map without requiring the content. This allows changes to be made. This is what you're referring to? Okay. And that is a key distinction that was made over the prior art. The entire preceding discussion is that the problem with prior art is if you have metacodes of content intermixed in any way, that impinges your ability to edit one independently of the other, as they put it in the file history, without access to the other. But I think Mr. Dunner's response to that, or at least one of his responses, would be very reliant on the word can. Because the word can, which is used in the sentences you're referring us to, is a permissive term. Therefore, it's not a limitation. So what's your response? That is the response from I4I, and that was the response by the district court. But that choice of words doesn't take away the fact that when you read the specification, that is what was claimed to distinguish it from the prior art. And that is made, I think, clear beyond dispute in the file history. I agree with you. I mean, this really tells me a compelling story about how they perceive this invention to work. The difficulty I have, though, is I feel like I have to find a clear and unmistakable disclaimer. And that's a high burden. And even though it seems to me that they're advancing their ideas about how their invention is going to work, and that might in theory involve or require even independent manipulation, the claim language itself doesn't contain that requirement. And I can't read that into the word distinct. Independent manipulation can't be read into distinct. It has to be a disclaimer. You're asking me to put a limitation to inspect into the claim because there's no choice but to do so. Two thoughts, Your Honor. With regard to the specification, I believe the court's current law does not require a clear disclaimer.  and decide what made that invention an invention. I think that's true only when you're construing a particular claim term. And I don't think distinct can fairly be construed to read in independent manipulation. Perhaps the file history will help on that issue. Because on distinct, and this is, I think, a critical point, on distinct, the examiner specifically said, well, distinct is meaningless because that just means different addresses. And I4I's response is telling. I4I's response, and this is at 2796, said, well, the architecture of the document can be treated as an entity having distinct storage. So they gave that term meaning where the patent office was saying, I'm sorry, distinctness has no meaning to me because, and I'm going to find it obvious. This was a rejection where they found obvious because distinctness has no meaning. And the patent owner, to get around that objection, said, I'm sorry, here distinct does have meaning. Distinct has meaning because it means it can be treated distinctly and stored distinctly and can be independently manipulated. But hold on. On 2796, and this is going to be a slight aside, so let me just say this until I have to get it out of my system. I found very frustrating the prosecution history that you gave us. Okay, so here is the sentence you're referring to, that the examiner's rejection. That sentence doesn't even end here. It carries over onto the next page. But we don't have the next page. So the key sentence, that's every single office action and every single response. You gave us like one page and sometimes referred to something that actually carried over and we didn't have. I printed them all off paper. I've been through the whole prosecution history at this point. And truthfully, you gave us all the relevant stuff and hindsight, but it left me sort of wondering about context. And so next time I would advise both parties to be more sensitive when you're raising an issue with referring to prosecution history to give us all the meaningful stuff. But anyway, go back to it. So on 2796 when the response says this separation allows distinct processes to operate on the content and the architecture with or without the knowledge of the other, why couldn't that be just, okay, I'm going to present to you a single document. Here's the content at the top. Here are the metacodes at the bottom. You can work on each one independently. They're not intermixed. Why wouldn't that possibly be something that could satisfy, could be an explanation they could be advocating? Is that wrong or does that conflict with something else they explained? I don't think that's consistent with the next sentence. Because of the access? Well, wait a minute. Isn't it possible? I mean, you're representing these Microsoft people. They're awfully smart. I have no doubt they could find a way to give access only to a portion of a document and make the rest unaccessible. I find it frustrating sometimes that their intelligence is used against them in a way that isn't supported by the intrinsic record. But the point I think that my belief, and your honors can read it as well or better than I can, I don't think there's a fair reading of this patent and this file of history, particularly in light of their response to the office action, which doesn't give distinct meaning beyond their sort of different addresses. And that's all the district court's construction did. The best office said that can't be what it means, and they agreed with that. One more thing I just want you to respond to before you likely move on from this topic is what about when the patent itself at column four says a document and they say this is a non-random aggregation of the data irrespective of its mode of storage? I don't think that means not meaning it has to be stored not sort of distinctly because they've said over and over again it has to be stored distinctly. That's a highly ambiguous term. It could mean it can be stored in flash or hard drive. It could mean a hundred different things. But what it can't mean, it's not a get out of jail free card that says distinct storage is meaningless. After we told the patent office it's meaningful in response to a rejection, after we said over and over again in the specification it's what makes this important, and after the red brief admits it's key to the invention. It can't possibly mean just different addresses. Other issues you want to hit? I don't want you to lose all your time. Let me move you on to validity, namely obviousness. Let me see if we're on the same wavelength. Do you agree that Microsoft can't challenge the jury's factual findings underlying claims of obviousness based on DeRosa and Rita and the other prior art? We agree with that. Okay. We don't agree that that means that A, and normally that would limit you to a new trial, which we did ask for and there's no debate, but that's not it. What we don't agree with, and this is an issue post-KSR that, frankly, has not been developed from the law yet, is what effect that has on a request to change as a matter of law, because obviousness, of course, is a question of law, where the facts that were disputed below don't matter, where it is a question of law. Wait, but so many of the arguments you made were facts. You want us to say something about analogous arts. Well, determination of what is or is not in the analogous arts is 100% a question of fact. We affirm repeatedly by our case law. So how is that not an argument asking us to look into a factual issue? Well, two things. First, the facts aren't disputed. The facts aren't disputed about what makes it analogous or not. Well, the ultimate determination of whether something is or is not in the analogous arts is a question of fact. If it's made by an improper standard, which it was here, because what the district court did was to say, I'm going to decide it's not analogous because it's in a totally different area, translation versus document processing. This court's precedents say that's not the right standard. The question is whether it's reasonably pertinent. They're both in the same class in the PTO. They're in class 715. It was cited by the examiner. How could it not be reasonably pertinent? But again, and maybe I would agree with you, but it's all fact, and that's off limits because you didn't move for Jamal. In my view, those facts are not disputed, and we're talking about conclusions. The conclusion is not a fact. I understand your honest point. In my view, the application of an improper legal standard to those facts makes it a legal question. But independent of all of that, if you agree with me, then we get a new trial because that was not done properly as well. I would like now to turn to the issue of indirect infringement, if I may, and I'd like to start, if I could, with the question of Sienta because the knowledge of a patent is, of course, an absolute requirement for both contributory and indiscipline infringement. It is undisputed here. Several things were disputed. First, there was never an allegation of infringement, never an exposure of claim charge or even a conclusory allegation of infringement. In fact, quite to the contrary. When they studied our beta copy, they congratulated us and never said anything for four years. Second, they never gave us a copy of the patent. That's undisputed. Third, they never communicated to us anything about the contents of the patent. Also undisputed. Fourth, there's no evidence that anyone at Microsoft ever read the patent, no evidence at all of that. And fifth, there's no dispute that the only issue, the only evidence that's in the record as to what they're basing this fundamental knowledge requirement on, is two things. First, that they explained their product to us, which they did, but there's no dispute also that we didn't copy that product. They conceded that. So the knowledge of a product, and even knowing that that product is patented, tells you nothing about the contents of the patent, which is the requirement for SIEMSA, for Contributory Induction. But counsel, the e-mail, and you did move for Jaymall here, certainly, but still, it's a jury verdict on a factual issue, and so we have to look, and there is this e-mail that provides the description of the product, says it's patented, gives the patent number, and all of that, undoubtedly, was in Microsoft's possession. No dispute. So you think for there to be intent, there has to be testimony from someone saying, I read the patent and I know what it said? I mean, circumstantial evidence of intent has been held sufficient. Circumstantial evidence is certainly sufficient where there's a basis to infer that they read the patent. There is no basis here. You can't take an inference out of the air. And all that's present here is they told us we had a product, they showed us how it worked, and they gave us a patent number and said it was patented. That is not information about the contents of the patent. Charles, why is it unreasonable inference that given the material that we know, and Judge Moore just cited, that someone read the patent? I mean, I find it hard to believe that someone at Microsoft didn't read the patent. Well, I think that's speculation, which is not an inference. The answer is here, as I4I contends, I4I argues that we were these great partners and they were congratulating us on the product and we were working together. Why would we go look at a patent number when there's no allegation of infringement? You're saying all the statements that are in the record about the quality of the I4I product on the part of Microsoft employees and so forth is based not on any knowledge of the patent, but rather on the information that was provided to Microsoft by I4I about the product. Explicitly. There's no doubt about that and no contention otherwise. And there is simply no basis in this record to draw the inference that Judge Moore was suggesting. You have to have that inference locked in something. Otherwise, you're saying that inference is always present from merely being given a patent number and knowing it attaches to a product. And this Court has never held that. And for that reason, it's for exactly that reason that I4I argues not for that inference in its briefs. I4I argues based on broad comment of duty to investigate. So even I4I isn't arguing that the inference that Your Honor is suggesting is supported by this record because it's not. Before your time runs out, I know you're hoping we don't reach the issue of damages, but in case we do, can I ask you a damages question? And that is, why wasn't Microsoft's identification of X metal as a competing product sufficient to make it a reasonable benchmark on which the damages expert could rely? Microsoft didn't actually identify it. Well, I guess it did in one way. It did. Are you taking issue with the fact that X metal was a proper benchmark? Oh, yes.  And the issue for whether this propriety is a benchmark is not whether it's in the space of X metal editing. Because the patent isn't an X metal editor. It's an X metal editor 12 layers down. There are hundreds of X metal editors that don't infringe. The question of its propriety as a benchmark hinges on two issues. One, does it practice the patent of invention? And their own expert admitted there was zero evidence that it did. So we don't even know, the issue of the benchmark is, is it a sufficient proxy to tell us what the value is of a patent of invention? That's the point of a benchmark, right? And it can't possibly be a benchmark if it doesn't practice a patent of invention at all, and they have no evidence of that. No one bothered to look. That's point one. Point two is you have to decide, even if it is something that practices the invention, you have to decide the components of its value that reflect that patent of invention. Here the price of X metal was $500, $499, which is multiples times what all of Word costs. So you know $500 can't be the right value because it's more than what we charge for the entire Word product, much less the little sliver of functionality that's used here. And I found it very compelling that the notion, I mean it seemed to me Mr. Wagner assumed that 100% of the people who bought Word would have alternatively bought a $500 version. Price and elasticity is a simple economic concept, and it totally teaches against that notion. You know, you've got me hook, line, and sinker, but here's the problem. How do I get there? Again, we have no JML motion. Most of your brief goes to the sufficiency of the evidence for damages. Our cases, which aren't cited by either side, of Advanced Display and Mace and Biodex and Juergens say in exactly this situation, we as a court can't touch the sufficiency of the evidence. It is not available for our review. On a new trial, all we can look at is abusive discretion or legal error, neither of which includes sufficiency of the evidence. So what do we do? If you throw out Wagner, and you throw out Wagner. We didn't throw out Wagner. You want me to find the district court abusive discretion by not including him under Dauber. But hold on, let's look at all the regional circuit cases on Dauber because they all say, and this is one of my favorite quotes, they say garbage in, garbage out, not unreliable. That goes to the weight of the evidence, not the reliability. You have no problem with the methodology of choosing a benchmark. You explicitly acknowledge in your brief that it would not be unreasonable to choose a benchmark. In fact, I can read you the sentence if you need me to. You don't like the choice he made of the benchmark. That's garbage in, garbage out. We don't like the pick you made. We don't disagree with your methodology, but we don't like the pick. We disagree violently with his methodology. We don't disagree with the overall concept and the error that you can pick a benchmark. That doesn't mean we buy into his methodology. We objected explicitly to his methodology. His methodology was to take the Georgia-Pacific analysis and say, I think that the starting point of Microsoft's analysis when it sat down to negotiate with I4I is, don't take the value of our product and apportion it properly the way Lucent and other cases require you do. Let's take this $500 product over here, but don't apply their profit margin to it because they're going out of business. Apply our very high profit margin to it, and then take 25% of that and we'll give you that. That is his methodology. He applies a suspect 25% rule in a way that's never been blessed by any court anywhere, and that methodology is absurd. And that methodology should have been thrown out below, and it was in a piece of discretion, and you should still hold it. That is our view. Wait, so is your problem the choice of X metal as the benchmark, or is your problem the combination of X metal plus the application of a 25% Microsoft profit margin to someone else's product? I need to understand exactly, pinpoint for me exactly what the biggest problem is with the damage. Our problem is his entire methodology, which I just laid out. His entire methodology is, I'm using the 25% rule in this transmogrified form, but no one's ever used, ever blessed, ever. That's a methodology. It's wrong. And that methodology has to be tied. Lucent and other cases make blindingly clear that you have to tie your opinions to the facts of the case. And if not, you throw it out. And we've cited several cases that say you must throw it out. That is the law. It's not everything goes to waste and you can just go do it on a price. But why is it called a methodology and not choice? Because all of the regional circuits say you don't like the choices, the things that are selected and put into the equation. That is all for weight and to be argued on cross-examination, but does not go to the reliability. And there are umpteen cases I have in front of me that say this. We are not challenging at a sort of high level because they were challenging his choice of X method. But that's not what we're challenging at overall. We're challenging his methodology, his Georgia-Pacific analysis, analysis in quotes. Yeah, but you don't have any problem with Georgia-Pacific. You agree that that is an appropriate methodology. You just don't like the way he did it. But then you're saying that any challenge to Georgia-Pacific or any challenge to a benchmark can't ever be challenged or doubted. And that's just not the law. Why? Show me a case that says it's the law. We've cited several cases where they've been thrown out because they were unreliable. They didn't tie anything to the link to the fact of the case. I guess I don't find that. I want you to show me the case because I look on page 65, 66, and 67 of your brief where you cite more than seven cases that are relatively close on point, and every one of them involves a review of a JMAL motion, not reliability of a Daubert witness. And so this is my frustration because I'd love to be able to reach and get into some of this stuff, but I don't feel like I can. The law squarely gives you the permission to do that. You say that, but I need to know which law. I will look for the specific case that you're asking for and give it to you in a rebuttal if I can find it. If I may, I'd like to return very quickly to indirect infringement, if I may. And if I can, very quickly, I'm willful. Indirect infringement, there's one point that I wasn't able to make with regard to Sienter. And the issue there on BROADCOM. BROADCOM does not stand for the proposition that there's a duty to investigate to find the patent. It doesn't. In BROADCOM, there's an explicit allegation of infringement with detailed infringement contentions. It says once you have that, then you can't stick your head in the sand. There's no holding in BROADCOM or in any other case that says you have to go find the patent and read it. And that is the allegation that is explicitly made, not an inference from the evidence here, but a duty to investigate. That would be new law and it would be inappropriate law. Non-infringing use is critical as well. Here, their own survey, which was relied upon to prove infringement. And if that's not reliable, they don't have infringement. But their own survey established that the non-infringing uses were greater than the supposed infringing uses. And while frequency of non-infringing use is not required, under Vitamix and other cases, it's clearly sufficient. If more people use the exact – and we're talking about the exact same accused functionality, not word as a whole. So it's not that issue. It's not a HODOPS issue. If more people use that specific accused functionality for non-infringing use than infringing under their own evidence, how in the world could that be insubstantial? And they have no answer for that at all, none. They didn't have an answer for that below. They don't have an answer for that here. With regard to willfulness, very quickly, if I may, there's really two issues, I think, for the court. One, they explicitly argue, the district court explicitly argued, for a duty to investigate, which Voda and other cases have rejected explicitly. That's just false. But second, the district court and I4I, but I4I in an attenuated way, argues that the strength of defenses that served at the trial is, in the district court's words, irrelevant unless you can prove they were perceived at the time of infringement. That is not this court's law under Cohesive, under Black and Decker, or any other case. No, but even if we agree with you with respect to the law, the problem here is most of your argument with respect to the defenses you raise had to do with other issues that were ultimately thrown out. They weren't the defenses that were part and parcel. And I can understand. You look at defenses with respect to the validity issues that are currently before us. And it seems to me most of your argument with respect to the strength of your defenses went to issues that never got anywhere. Well, it got anywhere. The issue under Black and Decker and Cohesive isn't whether they won before the jury. The issue is whether they were, quote, legitimate, credible, or reasonable. Those are the words being used by this court's authorities. And I don't think it's possible to say that the defenses weren't credible, legitimate, or reasonable. And the last point I'd like to make on that is the Patent Office's re-exam decision, not just accepting the request, but an actual decision rejecting, not firing, but rejecting the claims on exactly the prior accommodations that was argued below, I think it is difficult to see how one branch of the federal government, the district court, could say that another branch of the federal government, whose job it is to look at validity, that their decision is not legitimate, credible, or reasonable. So I would assert that as a matter of law, when you have an actual rejection from the PTO on the same art that is being asserted in the district court, not for purposes of validity, we're just talking willfulness on the objective prong, I think it's improper to say that the Patent Office's decision is not credible, legitimate, or reasonable, such as to eliminate the objective prong. Can I ask one quick question on Seagate, on the point you were making about looking at the objective inquiry, how is that consistent with the other things, well Seagate talks about in ordinary circumstances willfulness will depend on infringers' pre-litigation conduct. So by looking at just what happened in trial in terms of the strength of the defenses, how does that dovetail with the other guidance? Seagate's discussing subjective, they're not objective. And the post-Seagate cases on objective, Black & Decker, Cohesive, and others, have all applied the defenses of trial without regard to when those were perceived or perceivable. That would be new law, and I would suggest inconsistent with Seagate. Thank you, Mr. Conner. We'll restore your five minutes of rebuttal, and you've gone over, in addition by, we'll call it four minutes, so you'll have had, if my counting is right, when everything is settled up, a total of 39 minutes for argument. So, Gunnar, if you need it, you'll have 39 minutes for argument. So we'll set the clock at 39 minutes for you, so you have that. That should equal it out. Thank you, Your Honor, but I pray I won't need it. Well, did your red brief give away your case on client construction? Pardon, Your Honor? Did your red brief give away your case on client construction? Absolutely not, Your Honor. The fact is that there is no requirement for independent manipulation. There's no requirement for not having access. The specification makes that clear. We never gave it away. It has to be separate. We don't deny that it has to be separate, but it is separate. The question is, what does separate mean? If you listen to Mr. Powers, he takes it bit by bit. He says, if all you have is a single bit, how can it be separate from any other bits? But that isn't what we're talking about. We're talking about separate metacode math, separate from math content. And if you can envisage a bowl of jelly beans, and you had yellow jelly beans and blue jelly beans, and they were all mixed together, then Mr. Powers' point might have some significance or value. But if you have the bowl divided so that you have a mass of blue jelly beans here and a mass of yellow jelly beans here, they are separate. And that is the whole concept. The fact is that Your Honors have focused correctly on Figure 9. You can also focus on Figure 7, which also shows that the user has access at the same time to both the math content and the metacode math. And you can also look at the very top, Oval 132, Input Device for Creating Content and Selecting Metacodes. The user has access to both. And it's not only the Figure 9 statement that has the statement about updating, but if you look at Columns 6, Lines 14 and 15, the math content area and metacode math is updated as changes are made. Okay, I'm a little slower than you're going right now. Go back to Figure 7. What is it about Figure 7 that shows me the user has access to both? If you look at Figure 7, you'll see Oval 132, Input Device for Creating Content and Selecting Metacodes, meaning the user has access, knowledge of both. Their point is it's got to be without access. It's got to be without knowledge. They mention that multiple times in the brief. And a question was asked about the file history, and Mr. Powers focused on the wrong words. Judge Moore, I think you focused on the right words. If you read the statement at 2796, it says, This separation allows distinct processes to operate on the content and the architecture with or without knowledge of the other. Now, the next sentence, which Mr. Powers focused on, he said, you didn't look at the next sentence. But the next sentence starts with, in other words, meaning it's a summary of what precedes it. And all it says is, in other words, using the present invention, one could change. It's permissive. It's not mandatory. Every embodiment in the specification has automatic updating. When you update the metacode map, when you change the metacode map, you automatically update. You mean synchronization. Yes, it's synchronization. And in fact, it is interesting because Microsoft said it has flip-flopped. In its main brief, it said it blew 32. Because a change to one of the metacode map or map content, those are added words from the preceding sentence, requires a change to the other, the alleged metacode map and map content in Word 203 and Word 207 cannot be independently manipulated. Their independent manipulation charge is tied to this automatic updating. And they say, that can't be done. Then they get to their gray brief, and they do an about-face. They realize they've got a problem. And so here they say, independent manipulation by a user... What page do you want in the gray brief? No, what page in the gray brief. What page is four, gray four. Independent manipulation by a user is not inconsistent with automatic updating by the system. That's a total flip-flop. And I submit, Your Honors, that in fact, to follow Microsoft's claim construction would be to read out preferred embodiments in the specification that's impermissible under multiple decisions of this court. I'd like to go on to the invalidity point. Can we do inducement first? Just, ma'am, Mr. Powers focused on that. Let me just ask you a process question. In order to uphold the damages and the injunction, do we have to find that Microsoft induced and contributorily infringed? Or would it be sufficient to find one or the other? Your Honor, under Microsoft's theory, you need to do both. Under our theory, you need to do only one. And let me answer that by going to that point right now. And that is, they argue that there was an incorrect jury instruction, using the word component instead of material and apparatus, which are the words of 271C. And they say, under the law, if one of the legal theories is erroneous, then you've got to throw out the case, even if the other theory is. Our point is that the bad instruction, if it is a bad instruction, was totally harmless. It's totally harmless because the only reason they give for prejudice to them is that software might have infringed component, but doesn't infringe material apparatus. Well, Lucent versus Microsoft put that question to rest. Because 271C was involved, software was involved. They made the same arguments there that they have made in this case, and the court found infringement under 271C for software. So the only prejudice that they allege for the bad instruction is something that is not a viable prejudice. Moreover, there is no reasonable way, I submit, that the jury could have been affected by the use of the word component rather than material or apparatus. Because that debate was never in front of the jury. That debate was only before the judge on jury instructions. What the jury heard was testimony where Dr. Ryan said he used the word component or apparatus. He actually co-mingled the two. RICO, the RICO case, co-mingles the two. It talks about component in a software process situation, 271C. And so the point is that there can't be any prejudice here. The jury instruction was totally harmless. It can't be a basis for remand for a new trial. And therefore, all you need to find is 271B or 271C. That was a long answer to your very short question. I apologize. It is our position that both 271B and 271C are satisfied in this case. And while I'm talking about that, let me talk about that issue. I'm jumping out of the order that I would give, but I've long since learned to answer questions immediately and not defer them. The issue being the inducement and the argument that the Congress made with respect to knowledge of Microsoft of the past. Okay. We'll talk about intent and then whether or not there is substantial non-infringing uses. Those are the two points he made. There is more than this is. I agree totally with Judge Moore. It doesn't make any difference whether I agree with Judge Moore, where she has the final decision. But in this case, I do agree that this is a fact. It's a fact question. And there was ample evidence here for the jury to have found intent under either 271B or 271C. For over a three-year period from 2001 through 2004, there were dealings where the details of the I4I system were explained, where it was repeatedly explained, it was patented. Microsoft gave instructions to its users as to how to use their XML editor in a way that would have infringed, the testimony says, that would have infringed. There are documents, Microsoft documents, saying that they're going to obsolete I4I system. This was an aggressive, a former partner in Microsoft's own words, an aggressive attempt to actually eliminate I4I as a competitor from the system. I submit under those circumstances, particularly the DSU case, which is a 271B case, which arguably has a higher standard of intent, it basically says that you have a duty, you don't need to know that the actions would induce infringement. You should have known that the actions would induce infringement. And then the in situ form case, which we also cite, they talk about active or constructive knowledge. I guess Mr. Power's argument, as I understand it, is knowledge of a patent number is not the same thing as knowledge of the patent. Your Honor, we describe the patent as covering, the patent covered the process they were in. The S4 technology, is that right? S3, S4, something like that? Wait a minute. I think the email said something like the S4 covers the S4 technology. So we said it covered the process. At the very least, they had a duty disclosed, particularly in a situation where you have an aggressive company with a lot of market power concluding it's going to obsolete its competitor's process. And in fact, they did obsolete it in 80% of the market. Well, when you said duty disclosed, did you mean they had a duty to investigate? I misspoke. I misspoke. The point is... Well, wait a minute. In the willfulness context, didn't we sort of get rid of this duty to investigate to some extent? Why would we now give it vitality through 271B? Because Broadcom holds that the rules as to willfulness do not apply in an indirect infringement context. So that's exactly right. In the willfulness context, Seagate says you don't have a duty to investigate. That is not true, we submit, in an indirect infringement context. Now, unless there are more questions about it, I'd like to go to the substantial non-infringing use. There are three alleged substantial non-infringing uses, and the Vitamix case is very instructive, the recent Vitamix case, because it basically tells you that there... it gives you sort of a benchmark, I hate to use the word benchmark because it comes up in another context, as to when it is infringing or non-infringing, or whether it's substantial or not. And it talks about... it cites two different cases. It talks about utility presence and efficiency of the non-infringing use, and alternatively it talks about whether the alleged non-infringing use is unusual, far-fetched, impractical, aberrant, or experimental. And there were three non-infringing uses, and Dr. Rine addressed his comments to all three, and he concluded that they were all three non-infringing, and I will explain why his testimony relates to the Vitamix test. The first one is a case where somebody's working with XML documents, with metacodes, but there's no content there. And his conclusion was that the only purpose of doing that is to add content and resulting in infringement, and that, he concluded, was a non-infringing use. The second one was the use is created by XML documents that are never reopened, and Dr. Rine said that has no relevance to how, in the real world, users use an XML editor, and he concluded that that was not substantial. And that, of course, would be unusual, that would be far-fetched, that would be impractical under these Vitamix tests, and the first one would have been, I submit, far-fetched or impractical. The third one is the one that Mr. Powers focuses on, and that's the one where there were several million, I think there were two million pieces of evidence, or two million events, where the XML documents were saved in a binary format, which they called dot-dot or dot-dot, and they can't be shared with other systems. And Dr. Rine pointed out that this contravenes the fundamental purpose, not of the patented invention, but of XML, which is to create a system that can be shared with other systems. So, again, this fits into the Vitamix test. It's impractical, it's lacking in utility. So we submit that it's a red herring to argue that there are non-infringing uses here, and moreover, that issue doesn't cut across 271B in any event. 271B would remain viable. Can I move you to damages before your time runs out? Oh, I have plenty of time. If that's worth being suggested to Mr. Powers, I mean, for the economists in the room or the consumers, there is a lot of appeal to the notion that you're using as a benchmark a $400 to $500 product when the product of Microsoft Word costs something less than half of that, and what we're talking about is one of many, many, many, many components or functions within Microsoft Word. There's something that's intuitively problematic, I would suggest to you, about having done that, about that methodology. Well, let me explain, then, why the benchmark was chosen, and as part of that explanation, I think I will, I hope, to answer all of, even your intuitive concerns, if they're not real concerns. One is, why was that benchmark chosen? The benchmark was chosen because it was Microsoft's policy to add functionality to Word, to its basic Word system, without charging for it. The one time they charged for it, they charged $50 across all of the Microsoft systems, and if you follow the same methodology of applying the $50 across all XML systems, even though somebody might not have infringed using that XML system, you end up not with a $98 per unit royalty, but with a $2 unit royalty, following the same methodology. But let me go back to why you chose... Wait, wait, wait. You can't use that, though, because you've got to prove infringement of a method patent here, not an apparatus patent, in which case you could look at the $2 per product capable of infringing, but since this is a method patent, and for damages purposes the only thing you can turn everyone towards is the instances of actual use of the process, because that's the only thing that infringes, we are stuck with the $98 per product royalty. $2 is not on the table. Let me accept that, Your Honor, and I think our answer is still a viable answer. He picked XMetal because of the fact that the $50 use that Microsoft added was a very low use. Their practice was not to charge for added functionality to induce people to use their systems. So he decided, rationally, I submit, that he couldn't use the $50 number as an example. So what did he do? He looked for other possibilities, and he found that there were three other possibilities out in the market that Microsoft considered competitors, one of whom was XMetal. Of the three other possibilities, XMetal was the cheapest by far of those three possibilities, so that, in turn, additionally, was a rational use. He also considered the possibility of I4I system, and that was a little lower, but they combined with the sale of that system was services, was consulting, and what have you. He concluded that the total price would have been more for I4I system, so he decided that the XMetal system was the best benchmark, and he needed a benchmark. He needed something to start with. Why? Why didn't he start with the cost of Word and then figure out how much of the value of Word is attributable to the XML patented technology? Your Honor, because it was difficult to do that, because Microsoft doesn't charge, typically, for these added functionalities. So I don't think it was practicable for him to start with Word. He needed to start with an XML add-on. So you think a $500 software package for XML, which is only a tiny portion of the huge functionality offered by Microsoft Word, is a reasonable one-to-one substitute. You think every person that bought and used Microsoft Word for an infringing use would have alternatively bought the $500 XML XMetal product as an alternative if Word did not offer that functionality? I mean, that's totally irrational. He did not include all of the total number of people who had the XML functionality. He only used, based on the survey, the people who, in fact, he included, based on the survey, used XML functionality. No, that's right. He used everyone who uses XML functionality in Word. But even the people who use XML functionality in a $200 product, how can you suggest that every one of them would have bought a $500 product if they couldn't, right? I mean, simple demand curve. I go to the store. I want a VCR or a Blu-ray DVD player or something like that, and I find out it's $300. I might be willing to pay that. But if I go to the store, the same person willing to pay $300 is not willing to pay $500 for the same thing. I might at that point say, well, I don't need it that bad. Your Honor, we submit that if the person wanted XML, of course, he used the 25% rule, and then he depreciated that a little after his calculations. We submit that if the person wanted to use XML functionality and they had choices, they didn't want to buy a whole Word system, that they would have been willing, for those who wanted to use it, for those who infringed, which is the only ones that the $2 million total number affects, they would have paid. Isn't it a flaw in his methodology, though, to not have asked? I mean, we say we need a survey. You needed a survey. The survey worked with respect to who used it. That was a relevant factor. Isn't it equally relevant and necessary to establish that once you've identified the people that use XML on a daily basis, that they would have, in the alternative, gone out and spent a lot of money for just that function in a separate program? That could have been a question that's asked, but I submit to you, I hate to just rely on the fact that this is a sufficiency of evidence standard, but it is. The jury heard all of these arguments. Microsoft made all of these arguments before the jury. Microsoft cross-examined Wacker, cross-examined Wecker, attacked the quality of the survey, attacked the quality of the Georgia-Pacific analysis that Wagner made, and the jury accepted the verdict. Counsel, I don't think that Judge Gross and I are focusing our questions on Jamal because that wasn't raised here. So we can't look at all of this for sufficiency of the evidence. That's off the table. I think we're looking at it under Daubert. Should Wagner have been allowed to offer this testimony or is his methodology flawed because he didn't use the right equation? He missed entire variables that should have been in there. Is that methodology so flawed to render it unreliable and therefore inadmissible under Daubert? That is what really the focus of our questions are on, just so you know. Your Honor, I realize that. I don't think his methodology was flawed. You're suggesting that he might have asked additional questions. I assume that in any survey that's made, somebody can come up with additional questions that might have been asked. It may have even been nice if he had asked these additional questions. But what he did ask, the survey, basically was trying to identify people who used the XML editor. There were 988 surveys out there, 46 were not funded, 19 were found to have used it. He only used the 19. He assumed that every other one of the 988 or every other one of the 46. This all goes to a different question. All of the testimony that you're discussing now goes to how many people use XML technology. That doesn't go to whether or not those people would have purchased a $500 alternative, which is the thing that I think our questions are struggling with. The notion that a $500 alternative would have been a one-to-one substitution. I guess my concern is, is this a question of methodology or choice of what you're substituting into a formula? Because in my view, if we just think he made the wrong choice, then that's not something that should be struck under Daubert. But if he employed the wrong methodology, then it absolutely is something that is questionable under Daubert. Let me try. Okay. There are two things I'd like to mention. You may need all that time after all, huh? I may. I may. We still have 16 minutes. Thank you, Judge Shaw, for accommodating. You're welcome. There are two points to be made. One is that when somebody had paid this much money for this functionality, I submit this ample evidence in the record to show that somebody would have. Somebody? But everybody? Well, let me give you the evidence to show you why I think a reasonable conclusion could be made that anyone who used this functionality would fit in this category. You can reject it, but I'd like to just make the point. One is that the argument was made that the XML functionality was just a small, tiny, obscure functionality of words, and maybe even a tiny, obscure functionality of XML itself. But we pointed out in our red brief that, and this is clear at 7684, Microsoft touted the XML as a core technology to Word. I don't think they used the word core, but the words they used are equivalent. It was a very important functionality to Word, and that a custom XML was, and this is a quote, was the most important effort it did on XML in Office since ever, and that's at 7565. There are several key Microsoft documents, and one is at 7684, and one is at 7291. 7684, it says, Microsoft has truly embraced XML as a key component of our company-wide strategy going forward. Office 11, which is Word 2003, will lead the way in delivering the benefits of XML to the desktop productivity customer. Then at 7291, it says, if we're betting the farm on the XML revolution, an XML editor should be an absolutely fundamental component of our product system. And then there's another document, also at 7291, and I will mention that that one was directed directly to Bill Gates. That one says, an XML authoring tool would be a logical new product for MS if Word was to morph in an XML direction, that would refresh that product and provide one more reason for users to upgrade. And in fact, Microsoft at one point did sell an upgrade. It was the HTML author, and they sold it for over $500. And so there's a lot of evidence. In fact, I can get you, hopefully I can get you that site. What was it they sold for over $500 that you were just talking about? An SGML author, it was called. And we mention it in our brief. Do you have the site for that? It's at 1388 to 1390. So there are all kinds of reasons why. I might have missed this. Did this SGML author offer XML technology? Yes, yes. But I guess even if I were to grant you everything that you've just said as completely gospel and beyond question, all of it goes to the notion that Microsoft thought, and possibly consumers too, that the XML portion of Word were important. And suppose I were to actually conceive something, I'm sure Mr. Powers never would, and say that every single person who used the XML technology bought Word solely for that purpose. Still, the Word product ranged from, what, $90 in some cases to $200 and something in others. Not all those people. Not everyone who's willing to pay $90 for something or $200 is willing to pay $500 for it. Well, I submit that they sold this SGML author for over $500. Yeah, but the problem you have here with damages, and I'm wondering if it's methodology or not, such that I should exclude, is I don't disagree that some people are willing to pay $500. The problem is that your expert assumed that everyone who bought Word was willing to alternatively buy the $500 product. And we both know not all those people are. I mean, I go to the supermarket, and if the price of asparagus is more than $3.99 a pound, I don't buy it. Sometimes I go, and even if I want it for dinner tonight, I don't buy it. Well, I can only tell you that the people bought the XMetal, and there is evidence, and I will direct you to it, A1468 at 7-10, line 7-10, and you'll have to read the words because there's a typo here, and it's a typo on an important word, but I think it can only be read one way. The words are that the additional functionalities in XMetal, it says totally are, totally and necessary. That doesn't make any sense, and in the context, it clearly means are totally unnecessary. So you have an XMetal product which sold for $499, which had a lot of functionalities, and he said it's totally unnecessary if you use it as an add-on to Word. So you have a unit that is sold XMetal. It's sold for $499, which people are buying. Mr. Powers said it has to be an infringing use. It doesn't have to be an infringing use to be a benchmark. There's no law that says it has to be infringing use. There has to be some relevant reason, some rational reason for picking it, and I gave you the relevant rational reason for picking it, but the point is if you have an XMetal unit which sells for $499, or is it $399? $499. Which was the cheapest one of the alternatives that he could pick, the cheapest one, and it has a functionality which people want to use, and the other functionalities are really not necessary as an add-on to Word. It is not unreasonable to assume that somebody who wanted to have that functionality would have been willing to make that payment, and what he did was he took the 25% rule, and he ended up with $96, and I think based on other factors it ended up being $98. What about that 25% rule? Why is that not just something pulled out of the air that we ought to be willing to accept as a methodology? The 25% rule is a factor that is used all the time in patent infringement cases. There are some people who don't like it, and Dr. Wagner admitted there are some people who don't like it, but there are a lot of people who do like it, and in fact this court's decisions, they're cited in our red brief, have sustained analyses under the 25% rule. It is a rational approach. The jury heard it. They heard the attacks on the 25% rule because Microsoft's expert pooh-poohed it, said he didn't like it, and so the jury, again, had an opportunity to decide. Certainly the 25% rule in the abstract is not a basis for throwing out or for applying the Daubert rule. The 25% rule is used all the time, and it's proper, and maybe the jury shouldn't have accepted it, but they did accept it in this case, and there was countervailing testimony on that side. Do you mind if I move you on to Wilhelmus? Okay. I think Mr. Powers raised a point that I'd like to hear your response to, which is we're not talking about introducing the re-exam evidence for invalidity, but simply on the issue of willfulness. Why wouldn't the PTO's rejection of the very claims that have been found to infringe in this case be enough to give credibility to their defense as a valid defense to prevent willfulness? Simply for this reason, Your Honor, there has been no response from I4I in that re-examination, so you have an examination so far which has been based on the input of one party. Secondly, the standard of review in the patent office, which is construing claims as broadly as reasonably possible, is very different from the standard of review in the district courts. And thirdly, there is case law from this court, which has held, I believe it's from this court, which has held reasonable not relying on a re-examination early office action because its value is greatly exceeded by the prejudicial effect to a jury. Right, but why not for willfulness, though? Why isn't it something that gives credibility to a defense, not meaning to legitimize it such that it should be adopted, but simply as a defense to willfulness? It's sort of like not for the truth of the matter asserted, but rather just to give credibility to the fact that they did have a good faith belief walking into this, that they were not willfully infringing someone else's patent rights. Your Honor, for the reasons I mentioned, one, the fact that the patent office has acted without any input from us is not a good measure of whether or not that's a reasonable, something reasonable to rely on by the other side, particularly in the situation where there's a different standard of review. I submit, certainly, it's not a basis for throwing out a whole verdict on the ground, certainly not an abuse of discretion. The question is, did the district court abuse its discretion by not admitting that evidence? I think there are ample reasons. People can disagree on whether or not the district court judge should have done it, but abuse of discretion is a very high threshold to reach, and I don't think it was reached in this case. Now... Do you want to talk more on willfulness, or can I move... I'm going to move you right along if you don't mind. No, please, go ahead. Okay. So I wanted to ask you a question about the injunction in this case. Yes. The court asked for some supplemental evidence or information from the parties regarding the record proof establishing what the district court said in his order with regard to the injunction. It seems clear from the language of his order that he intended to give Microsoft the amount of time it would reasonably take them to design around the patent in this case, namely five months, is what they said. He ultimately gave them 90 days, and he said in that order, there is some conflicting evidence over how long it will reasonably take Microsoft to do that, therefore I'm going to give them 60 days. So we asked the parties to submit what evidence it was that supported the notion that something other than five months, because his order very clearly cites the evidence and the testimony that it would take them five months, but it actually cites nothing in the way of conflicting evidence, and unfortunately I couldn't find any conflicting evidence that you all presented to us on the issue of how long it would take them to design around, not whether they're capable of it, not how they would go about doing it, but how long, the amount of time. I found no testimony that conflicted the five month notion. So I guess my question to you is, isn't that a clear error by the district court because he clearly intended in the order to give them at least the amount of time that was reasonable for them, and so isn't it an error on his part because it turns out there's no conflicting evidence that conflicts with the five months? Your Honor, the incident...